# PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

## EXHIBIT B

RICHARD KLAJNSCEK
REPORT DATED 2-6-17

# **seafoxconsulting** LLC

6 Sea Fox Lane, Gloucester, MA 01930 | Tel 978 239 7321 | Fax 978 865 9921 | rich@seafoxconsulting.com

February 16, 2017

Carlos Chardon, Esq.
Hamilton, Miller & Birthisel LLP
150 Southeast Second Avenue, Suite 200
Miami, Florida 33131

Re:     **Jennifer Ceithaml v. Celebrity Cruises, Inc.**
          Case No.: 0:15-cv-24139-KMW-AMS
          Date of Loss: December 9, 2014

Dear Mr. Chardon,

I have been retained by your office to render my professional opinion in the above-mentioned case involving an injury to Ms. Jennifer Ceithaml while participating on a zip line that is one element on the Wacky Rollers Adventure Park (WRAVE) course in Dominica.

My expert opinion found in this document is based on review of the materials listed below, my engineering background, the application of my intimate knowledge of the Association for Challenge Course Technology (ACCT) Standards since their inception, and my 27-year career in design, installation, training and inspection of Aerial Adventure Courses (Challenge Courses, Canopy/Zip Line Tours and Adventure Parks).

I reserve the right to amend or expand on the opinions expressed in this document if additional information relevant to my area of expertise becomes available in the future.

## DOCUMENT LIST

- Amended Complaint for Damages (Document 34)
- Plaintiff's Answers to Defendant's First Set of Interrogatories
- Answers to Plaintiff's Initial Interrogatories
- Deposition transcript of Jennifer Ceithaml, Plaintiff
- Video of Plaintiff on swing element.
- Plaintiff medical records - Home Medical Express, Inc. and Northwestern Memorial Hospital
- Plaintiff Exhibits 1-2
- Defendant Exhibits 1-15
- Wacky Rollers website
- Report of Edward M. Pribonic, P.E., Plaintiff Expert
- Association for Challenge Course Technology (ACCT) Standards, 8th Edition, Nov. 2012

1

## INCIDENT REGARDING JENNIFER CEITHAML

On December 9, 2014, while participating in activities on the Wacky Rollers Adventure Park on the island of Dominica, it is alleged that Ms. Ceithaml, while riding the first zip line on the course, collided with a foam pad on the landing tree and sustained an injury to her left ankle. Ms. Ceithaml was instructed to use the brake to slow down and/or come to a stop but did not do so. A guide in the receiving platform used his body to lessen the impact.

## BACKGROUND

The Park is owned and operated by WRAVE, Ltd. Ms. Ceithaml purchased a ticket to the park through Celebrity Cruises. Celebrity, which sold the ticket pursuant to an independent contractor agreement with WRAVE, was not involved in the ownership or operation of the Park.

My review of the file materials and my own investigation confirm that WRAVE has had an excellent safety record. I did not uncover any other instances involving collision injuries on the zip lines at the Park, which has been in operation for well over a decade.

## INCIDENT OCCURRED ON FIRST ZIP LINE AT WRAVE

Contrary to Ms. Ceithaml's testimony, her accident occurred on the first zip line on the course. The element that she thought was similar to the zip line where she was injured was a completely different element, one where participants hold on to a large-diameter swing rope with both hands while rolling on a pulley between two trees. There is no brake rope on this element and it operates differently than a zip line. The discussion that occurred in her deposition about the video and the "first zip line" should not be compared in any way to the zip line in question.

## COMPLIANCE WITH ACCT STANDARDS

Standards of the Association for Challenge Course Technology (ACCT) are, by far, the most widely accepted standards in the Challenge Course and Zip Line industry. They are the most widely adopted standards by owners, risk managers and insurers of Challenge Courses, including Canopy/Zip Line Tours and Aerial Adventure Parks such as WRAVE and are the most applicable to the WRAVE Adventure Park. Therefore, these are the standards that my opinions are measured against. Mr. Pribonic agrees with this assertion. At the beginning of his conclusion section (D. CONCLUSIONS) he states that "The most widely accepted standard relative to ropes courses and ziplines in North America is the ACCT Standard for Challenge Courses and Canopy/Zip Line Tours (Association for Challenge Course Technology), and represents the highest standard of safety. Formally incorporated in 1993, the Association for Challenge Course Technology (ACCT) is the world's leading and largest American National Standards Institute (ANSI) Accredited Standards Developer, focused on the challenge course and aerial adventure course

2

industries." These are the reasons I have applied the ACCT Standards to my evaluation of this incident. Additionally, I contend that the standards promulgated by both the PRCA and the ASTM are not appropriate standards to reference in this case. PRCA standards are not widely accepted standards in my industry and ASTM standards are generally standards for amusement parks. Although there is an ASTM standard adopted in 2012 for Aerial Adventure Courses, I argue that it is not the most appropriate standard to apply to this Adventure Park.

It has been alleged that WRAVE breached its duty of reasonable care under the circumstances and was negligent by violating industry standards and not providing a reasonably safe zip line.

The 8th Edition ACCT Standards were released in November 2012 and were in effect at the time of Ms. Ceithaml's incident. Several standards from the 8th Edition of the ACCT Standards were cited in the Amended Complaint, including the following zip line-specific design standards:

***H.1. Brake System:*** *All zip lines shall be designed and installed with an integrated brake system.*

> ***H.1.1.1. The Brake System shall:***
> * *Limit the deceleration of the participant so as to prevent a hazard to the participant*
> * *Perform its function without permanent deformation or failure of any associated components or equipment*
> * *Arrest the motion of the participant regardless of participant orientation*
> * *Not inhibit the participant retrieval procedure in the event that arrest occurs before the zip line landing area is reached*

**Commentary on H.1.1.1.**
This zip line does not require a brake system as described in the above standard because it is a low speed line with gravity-assisted braking. The brake provided at WRAVE is in the form of steel carabiners that provide friction by dragging on the zip line. The carabiners are each attached to a rope lanyard that is used throughout the course as a Personal Safety System. The use of this brake allows participants to maintain a forward-facing position and have some control over the landing speed. Ms. Ceithaml knew about and was instructed how to use this brake when at the starting platform of this line (Ceithaml, 118:2-5, 127:9-11, 128:4-7, 256:20-22, 266:16-17, 324:5-6) but failed to deploy it for an unexplained reason. Notably, she testifies that she did not think that she was going too fast (Ceithaml, p.120:7-8, 124:18-21).

***H.1.3. Emergency Brake Requirements:*** *An emergency brake shall require no action by the participant and shall either be completely separate from the primary brake or an integrated backup feature of the primary brake. An emergency brake shall be required if, upon failure of the primary brake, both of the following may occur:*

3

- *The participant arrives at the zip line landing area at a speed in excess of 6 mph (10 kph)*
- *The participant experiences unintended and/or harmful contact with terrain, objects or people in the zip line landing area.*

**Commentary on H.1.3.**
This zip line does not require an emergency brake because the participant arrives at the landing area at no more than 6 mph. See the explanation for this on page 5-6 of this report.

*H.2. Zip Line Landing Areas shall:*
- *Provide sufficient space for brake system operation and dismount procedures*
- *Provide protection from or limit unintended contact with zip lines, people and other components*
- *Be free from hazards that require participant action to avoid. Objects in the zip line landing area that have the potential to harm participants shall be covered with shock absorbing material*

**Commentary on H.2.**
The landing area on this zip line is typical of landing platforms on Adventure Park zip lines (5′ x 5′). It has sufficient space for landing and dismounting from a low-speed zip line of this type. The landing platform was a few inches closer to the zip line cable than ideal, but was still in the acceptable range. Although Ms. Ceithaml claims that the padding on the landing tree was "very, very thin" (Ceithaml 143:1), it was approximately 5″ thick (Photo 1 below). This is much thicker than the norm for most Adventure Park zip lines I have inspected. Similar padding was also provided at the platform edge, where leg contact is possible (Photo 2 below).



**Photo 1: Padding on Zip Line Landing Tree**



**Photo 2: Padding on Zip Line Platform Edge and Tree**

Although not required by standards, some landings have ramps, whereas others such as this one have padded edges on the landing platforms. Whether there is a ramp or a padded edge, it is normal to instruct Adventure Park participants to raise their feet upon landing on a zip line and that is what Ms. Ceithaml did (Ceithaml 126:7-14).

Typical Adventure Park zip lines are short in length and low speed so that they do not require any complicated brake systems, especially emergency brakes. By definition, Adventure Park activities are self-guided. Therefore these zip lines are typically designed and constructed so that participants arrive at the landing platform below the speed at which, regardless of action (more correctly, inaction) by the participant, they are unlikely to sustain an injury. Often, a gloved hand is used to help steer and provide some brake action, but at WRAVE steel carabiners attached to lanyards serve this purpose. The ACCT standards listed above were written with much longer and more complex zip lines in mind, and most of them do not apply to Adventure Park zip lines.

My investigation of the WRAVE Adventure Park focused on the zip line where Ms. Ceithaml was injured, its performance and the configuration of the landing platform. The line is 164 feet long (start pole to landing tree) and has a slope of 4.6 percent (elevation change of 7.54 feet). Although one of the wire ropes on this line had been recently replaced, it was equally tensioned with its original matching pair. There is no physical evidence that the original line had been adjusted or moved or that the landing platform and padding had changed. WRAVE staff was also questioned about any changes to this zip line where Ms. Ceithaml was injured and they confirmed that it was unchanged.

Based on my experience testing well over a thousand similar zip lines and verifying my speed using GPS, I took nine test runs of the zip line using WRAVE's participant equipment. My weight at the time of the test was 165 lb., 30 lb. greater than Ms. Ceithaml's weight at the time of her incident (from Home Medical Express records). This difference in weight is not large, but means that I would cause the zip line to sag somewhat more and have a slightly greater landing speed than her.

From these tests, I conclude that the line is configured so that the speed was completely normal and appropriate for an Adventure Park zip line and that the landing was appropriate. When doing these test runs, I used no braking action whatsoever in order to reach the maximum landing speed. Videos were taken of two typical test runs. From this testing, I reached the conclusion that this line does not require an emergency brake because the arrival speed at the platform does not exceed 6 mph per ACCT standard H.1.3. Therefore, any claims that an emergency brake of any kind or a staff "attendant" were required by the ACCT Standards, are false.

## REBUTTAL OF EDWARD PRIBONIC'S EXPERT OPINIONS

In his visit to WRAVE, Plaintiff Expert Mr. Pribonic focused his attention on a number of details of the WRAVE site and equipment, all of which had little to no relevance to the injury to Ms. Ceithaml. His evaluation of the zip line where the accident occurred did not include any kind of testing of the zip line or even a visit to the landing platform where she was injured. Therefore, he cannot accurately opine on the claimed need for emergency brakes, staff "attendants" or the appropriateness of a landing platform that he did not even stand on. This glaring omission seriously diminishes the amount of credence that should be given to any of his conclusions about the proximate cause of the injury to Ms. Ceithaml.

### OPINION No. 1

Mr. Pribonic visited the WRAVE site on January 17, 2017. The incident involving Ms. Ceithaml occurred on December 9, 2014 or over two years before the site visit. Although many details of the site remain the same or similar to the way they were in December 2014, the condition observed in January 2017 must take this time gap into consideration when developing an opinion. He concludes that "more than likely these conditions existed in December 2014, confirmed by plaintiff, plaintiff photos and videos of the lines, harness and platforms." I am only aware of the video of Ms. Ceithaml on a swing element and three photos, found in Defendant Exhibits 14 and 15 (which appear to be copied from the video), and Plaintiff Exhibit 2, none of which give any indication of the condition of the equipment that Mr. Probonic comments on. Photos and video available on the Wacky Rollers website and YouTube are in no way detailed enough to evaluate the condition of the equipment to the level that Mr. Pribonic did during his site visit. I also argue that the Plaintiff does not possess enough expertise to provide reliable details regarding the condition of the equipment when she was there in 2014. Mr. Probonic also speculates that, because a challenge course company named Triple Eagle dissolved "around 2011 to 2012", and no inspection reports were produced by Celebrity, nothing was done or changed between that time and the time of his site visit, and "support(s) my opinion that the conditions I observed, more likely than not, existed on the day of the incident". One

cannot assume that the condition of the equipment and structures in January 2017 are the same as they were in December 2014 and draw conclusions from these observations. With these caveats, the following are my comments on the photos in Mr. Pribonic's report.

The photos in Mr. Pribonic's report show:

- *Photo No. 2:* The cracked platform frame shown does not adversely affect the stability, and therefore safety, of the platform in question.
- *Photo No. 3:* The crack in the timber shown is at the very end of the platform frame is insignificant from both a structural and functional point of view.
- *Photo No. 4:* The wear shown in the harness clip-in point show wear through the protective sleeve over the main load-bearing webbing in the harness loop. The harnesses strength is not compromised by this wear and is not dangerous as claimed.
- *Photo Nos. 5 and 6:* The carabiners shown in these two photos are not used on Life Safety lanyards, but to connect the participant to the zip line trolley system. Although they should be lubricated, their proper operation is not critical to the safety of participants. I inspected every carabiner used on the Life Safety lanyards and they all operated properly.
- *Photo Nos. 7 and 8:* The fallen tree shown and described in both of these photos was blown down in Tropical Storm Erica in August 2015, after Ms. Ceithaml's visit to the site.

**OPINION No. 2**
As described in my opinion regarding ACCT Standards compliance above, there is no requirement for the platform to have staff members present in a self-guided Adventure Park with low speed zip lines. WRAVE is not a guided Canopy/Zip Line Tour. Any comparison with a guided tour or application of ACCT Standards for guided tours quoted by Mr. Pribonic (such as Operation Standard C.2.3.10.) are not appropriate. Therefore, the staff member at the landing platform, although positioned there to help, was not required by the ACCT Standards to be there, and therefore Mr. Pribonic's argument about required staff duties on the landing platform do not apply.

Nonetheless, WRAVE has always operated with staff members at both ends of zip lines in order to provide hands-on guidance to participants. The staff member at the take-off end instructs participants on the use of the brake and provides encouragement, and the staff member on the landing platform provides instruction about applying the brake and help participants on to the platform, even though this is not required by the ACCT standards.

Ms. Ceithaml acknowledged that she received instruction on how to control her speed on the zip line by using the brake (see specific references above). I believe that this instruction and the orientation she received when putting on her harness and other equipment and help on the course platforms was appropriate and sufficient for participation on this type of course.

7

Mr. Pribonic also states in the "ACCT RATIONALE" section that participants are asked to brake with a gloved hand. WRAVE does not instruct participants to use gloved hands to brake themselves, but rather to pull down on their dual lanyards to provide friction from the steel carabiners if needed. Mr. Pribonic references ACCT Standard B.2.4.3 in this argument. This standard number does not exist in the 8th edition of the ACCT Standards. The referenced standard was found in the 7th edition Operations Standards, and again only applies to guided Canopy/Zip Line tours.

**OPINION No. 3**

If Mr. Pribonic had visited the landing platform for the zip line in question, he would have been able to measure the dimensions he claims to be unknown. He attributes this unknown to the lack of engineering drawings of the zip line. The operation of this zip line depends more on how it actually performs than how it may have been drawn by an engineer. There is no requirement for engineering drawings for elements such as this in the ACCT Standards, and attributing the accident to the lack of drawings is disregarding the reality of the performance of the element as installed. From my experience both as a professional engineer and challenge course inspector, the best measure of an element is not based on drawings alone but more on inspection of the actual element in operation. Since Mr. Pribonic considers the configuration of the landing platform and approach speed to be critical and claims that the relative distance between the zip line and landing platform are "dangerously inadequate" among other things, he certainly should have ridden the zip line and landed on the platform in question to back up this claim.

The ACCT Standard (H.2) that he quotes in this section is discussed in my opinion above. He also quotes from Appendix A, which is titled "Discussion of Conventional Challenge Course Design". This section is not a standard (non-normative) and his connection between this discussion and criticism of the configuration of the landing area is an incorrect interpretation.

**OPINION No. 4**

Mr. Pribonic's claim that WRAVE failed to provide a safe braking system as required by ACCT is not correct. Refer to my opinion above for this reasoning. He says that Ms. Ceithaml's "life/safety lanyard (the line suspending her from the trolley and secured to her harness), was excessively long, positioning her such that the zipline, which she was to use as a brake, was approximately 8' above her…" I believe he has confused the swing element that Ms. Ceithaml thought was a zip line with the zip line where she was injured. The zip line cable is approximately 1' above the harness clip point and within easy reach of the participant (Photo 3). This whole discussion in his opinion is to be disregarded due to the confusion between the swing element and the zip line where she was injured.

8



**Photo 3: Participant harness and lanyards**
**The grey zip line lanyard and carabiner is top center**

**OPINION No. 5**
As discussed in my opinion above, this zip line does not require an emergency brake. For this reason, Mr. Pribonic's commentary on the need for an emergency brake should be disregarded.

**OPINION No. 6**
The addition of padding to the landing tree on Adventure Park zip lines is a widely accepted way to decrease risk of injury on landing areas of these low-speed lines. Therefore the existence of padding at WRAVE was not an admission of a deficiency of the brake system as Mr. Pribonic suggests. I have inspected well over a thousand similar zip lines on Adventure Parks, most of which have padded trees. I recommend padding similar to the padding at WRAVE when I inspect zip lines of this nature because it helps cushion any potential impact with the landing tree.

**OPINION No. 7**

Mr. Pribonic's reference to "abnormal hidden dangers of the WRAVE park" is without basis. I did not uncover any dangers, much less dangers that were hidden or abnormal, at the Park, particularly at location where the incident took place. In addition, Ms. Ceithaml signed an "Informed Consent and Paticipation Waiver of Liability/Release of Claims" form that clearly outlines the risks and responsibilities of participation in an Adventure Park. She also received adequate warnings and instructions from the guides, including instructions on how to reduce her speed and apply the brake. The ASTM signage standard Mr. Pribonic quoted from ASTM F770-11 is clearly for an amusement park setting and amusement ride passengers and not for an Adventure Park. There is also no jurisdictional requirement for WRAVE to comply with ASTM amusement ride standards. I believe that WRAVE provided appropriate warnings and instruction to its customers.

**OPINION No. 8**

Regardless of the standards cited in this opinion, the fallen tree that Mr. Pribonic shows in Photo No. 9 is the same one as shown in Photos 7 and 8 that was blown down in Tropical Storm Erica in August 2015, months after Ms. Ceithaml's visit to the site. The tree shown in Photo No. 10 currently has a rot pocket at its base, which may or may not be a critical defect. There is also no proof that this rot existed in December 2014 or that the tree was or is unable to act as a guy anchor. More importantly however, Mr. Pribonic cites nothing in his opinion that is relevant to Ms. Ceithaml's incident.

## CONCLUSION

Based on the facts and my opinions as stated above, I believe that the zip line at Wacky Rollers Adventure Park where the injury to Ms. Ceithaml occurred is properly configured for an appropriate landing speed, has a landing area that is normal in size and configuration for an Adventure Park, and does not need an emergency brake or the presence of a staff on the take-off or landing platforms. It meets the requirements of the 8th edition of the ACCT Standards.

As I mentioned earlier, Adventure Parks are, by definition, self-guided activities. Throughout his report, Mr. Pribonic incorrectly applies the ACCT standard of care for guided Canopy/Zip Line Tours to this Adventure Park, which is like comparing apples and oranges. Neither the ACCT standards nor the operating norms of the Adventure Park industry require a staff member on take-off or landing platforms, even though WRAVE provides staff on platforms throughout their course.

Mr. Pribonic failed to ride the zip line in question or inspect the landing area where the injury occurred, even though he and I both consider the configuration of the landing platform and approach speed to be critical. As I mentioned earlier, this glaring omission seriously diminishes the amount of credence that should be given to any of his conclusions about the proximate cause of the incident involving Ms. Ceithaml.

Mr. Pribonic's opinions concerning the conclusions that Ms. Ceithaml purportedly drew concerning the "primary operator" of the tour are outside his area of expertise and irrelevant to any analysis of the safety conditions of the zip lines and the Park. It is worth noting, however, that Mr. Pribonic's opinion ignores the numerous representations that Celebrity provided to Ms. Ceithaml that the excursion was operated by an independent contractor.

Although Ms Ceithaml received appropriate warnings and instructions for riding the zip line, including instructions on how to reduce her speed and come to a stop. She did not follow those instructions. Although she experienced an unfortunate injury to her ankle, she was treated at WRAVE with the standard of care of a reasonably prudent Adventure Park operator.

Respectfully submitted,

Richard V. Klajnscek, P.Eng.
Owner, Sea Fox Consulting, LLC

11