# **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

# **EXHIBIT K**

EDWARD PRIBONIC
REPORT DATED
1-30-17

# Investigation Report

## of the
## WRAVE, zip line incident
## at
## Roseau, Dominica

## December 9, 2014



Edward M. Pribonic, P.E., Inc.
4825 Hazelnut Avenue
Seal Beach, CA 90740 USA
(562) 493-2946

Submitted:    January 30, 2017

EDWARD M. PRIBONIC, P.E.

**INTRODUCTION**

I have been asked to serve as an expert consultant in the above identified case.  It is my understanding that I may be called to present expert testimony at trial.  I have prepared a written report with respect to that possible testimony.

It is my understanding that Jennifer Ceithaml was seriously injured in a mishap on December 9, 2014 while riding a zipline, at Wacky Rollers Adventure Park, at Roseau, Dominica.  In that regard, I have been asked to review various materials provided to me and evaluate any and all aspects of the zipline design, operation, and maintenance that I felt were relevant and within my sphere of knowledge.  I also made a physical inspection of the site, and inspected the facilities.

**QUALIFICATIONS**

I am a mechanical engineer specializing in amusement rides, devices and facilities.  I have wide ranging experience in the amusement industry, which includes amusement parks, water parks and rider interaction with equipment used in those facilities.  I have approximately thirty one years of experience in engineering design, approximately 29 years of which has been specializing in amusement equipment.  I have been a certified amusement ride safety inspector.  I have inspected numerous amusement parks, ziplines and water parks.  I teach amusement ride safety and safety inspection, and have been contracted by the state of California to create and present a course in zipline safety and inspection to the the California State Amusement Ride Inspectors.  I provide expert witness testimony in litigation involving amusement rides and facilities for plaintiffs and defendants.  I am a registered Professional Engineer in California.

As regards amusement rides, I have extensive experience in the inspection of this type of equipment, I have designed and supervised modifications and reconstruction of zipline equipment and I work frequently in the design, manufacture and installation of amusement rides and braking systems.

A copy of my current CV is attached to this report.

**DATA AND INFORMATION CONSIDERED IN FORMING OPINIONS**

The documents and information that I have reviewed and considered in forming my opinions are listed in the Appendix.  Because discovery is ongoing, I expect to continue my review, evaluation and analysis of information generated during discovery, as well as evidence deduced at trial.  I specifically reserve the right to supplement this report after considering any additional data or information.

**METHODOLOGY**

My methodology for arriving at my conclusions was to conduct a visual inspection of principal elements of zipline and ropes courses, a typical inspection, the type long established and commonly used, my review of the records listed in the appendix, field measurements taken on the day of my inspection, my experience and the study of requirements, priorities and recommendations of industry recognized standards.

Visual inspection is perhaps the original NDT, (Non Destructive Testing), method, and it is the first line of defense in inspection and verification processes.

My objectives were to determine by direct observation if on-site construction had been accomplished in accordance with industry standards, if the existing condition of the facility was functional and safe, and if safe operating practices were reflected in the installed equipment.   I also attempted to determine if the records and/or work activities indicate any generic problems, inadequacies, or other weaknesses that could impact the facility operations.

2

EDWARD M. PRIBONIC, P.E.



**Photo No. 1.** The Landing Platform circumstances violate the standard of care and the violations were contributing causes of this incident/collision by forcing Ms. Ceithaml to lift her legs toward the tree to avoid colliding with the platform.

### A.   DESCRIPTION

The WRAVE zipline is a single cable zipline in Roseau, Dominica. A wire rope is extended from a launch tower extending to a landing tower located approximately 150 feet. The landing tower is approximately 8 feet below the launch tower. Riders are suspended from a small trolley, a pulley like device that is situated on the wire rope, (zipline). The rider's suspension harness is attached to the trolley and the rider hangs below the trolley and zipline.

Once properly harnessed, the riders coast down the zipline, and are normally slowed by friction and a reduction of slope in the lower portion of the zipline. A complete stop is typically accomplished by the use of a "Block Brake", a wooden block mounted so as to slide along the zipline. As a rider approaches the landing platform, his trolley impacts the block and the platform attendant is to hold back on the rope, against the movement of the block, to slow and ultimately stop the rider. Other types of brakes are also commonly used.

The Wacky Rollers zipline had no mechanical brakes of any type, but instead relied upon the riders to grasp the zipline with a gloved hand as they coasted down the line.

The trolleys in use on December 9, 2014, consisted of a stainless steel frame containing two steel sheaves which are designed to roll along the zipline.

Without a mechanical brake of any type, it is necessary to have an attendant on the landing platform to assure a safe landing of the rider. If the rider does not adequately brake, the trolley then impacts the zipline cable clamps at the platform support pole in a violent collision which swings the rider directly into the support pole.

WRAVE had an attendant on the landing platform, but he was not performing his duties and watching Ms. Ceithaml approach the platform. She came into the platform fast and did not brake. The attendant was not in place and Ms. Ceithaml struck the support tree sustaining a serious leg injury.

3

**B.    OPINIONS FORMED**

It is my understanding that Jennifer Ceithaml was seriously injured while attempting to use a Zip Line, at WRAVE Experience. In that regard, I have been asked to review various materials provided to me and evaluate any and all aspects of the Zip Line design, construction, operation, and maintenance that I feel were relevant and within my sphere of knowledge.

**OPINION No.1**

- The WRAVE Wacky Roller Adventure Park consists of aerial adventure elements such as ropes courses, challenge courses and ziplines. The design of these elements, as I observed during an on-site inspection, and are non-compliant and dangerous as considered against criteria published by industry standards and various equipment manufacturers. The physical condition of the equipment and structures was unacceptable. Nearly every structure and piece of safety hardware would, or should, fail an inspection by a qualified safety inspector. It is more likely than not that these conditions existed in December 2014, confirmed by plaintiffs, plaintiff photos and video of the lines, harness and platforms. Defendant Celebrity Cruises admitted that it knew that the park was being inspected by a company called Triple Eagle. However, no inspection reports were produced by Celebrity. Triple Eagle was dissolved around 2011 to 2012, thus the park was not inspected for two or three years prior to the incident. I know this from my review of Florida Sunbiz report and the ACCT newletters included in the appendix. They support my opinion that the conditions I observed, more likely than not, existed on the day of the incident. ACCT requires inspections shall be documented in a written report and furnished to the owner. Failure to complete yearly third party inspection is a violation of the ACCT standard. Failure to comply with industry inspection standards were are more likely than not, a proximate cause of Ms. Ceithaml's collision and injuries.

Examples of unacceptable or dangerous conditions are illustrated in the photos below indicating a long term, on-going, lack of concern for safety even for the most obvious cases. Based on my profession experience these photos demonstrate egregious safety violations.



**Photo No. 2.**    Many structures, (zipline platform shown), had completely failed and others were severely deteriorated making them unsafe for any loads.

4

EDWARD M. PRIBONIC, P.E.



Fractured beam which carries the rope walkway loads should be replaced.

**Photo No. 3.**   The beam walking element support structure has failed.  This circumstance violates the industry standard of care, and demonstrates how dangerous, poorly operated and poorly maintained the facility is.



**Photo No. 4.**  Most of the life/safety harnesses were worn beyond the manufacturer's retirement criteria.  Use of harnesses in this condition is dangerous and unacceptable.  This condition violates the industry standard of care.

5



**Photo No. 5.**  Many of the support carabiners were so rusted or worn that they did not function properly.  The above unit is to lock automatically, but would not even close.  This condition violates the industry standard of care.



**Photo No. 6.**  This carabiner, attached to a participant harness, was too rusted to close automatically as it is required to do.  A condition like this can easily result in a fatality.

EDWARD M. PRIBONIC, P.E.



**Photo No. 7.**    A guy wire stabilizing a zipline platform tree is anchored around a section of fallen, completely rotten, spongy tree which lies loosely on the ground.  This has no structural integrity and is completely unacceptable by any measure.

7

EDWARD M. PRIBONIC, P.E.

**Photo No. 8.** This is the tree and zipline platform being "stabilized" by the dead tree anchor shown in figure 7. The platform is about 25' above the ground. This circumstance violates the industry standard of care, and reflects a dangerous, poorly operated and poorly maintained facility.

**OPINION No. 2**
- WRAVE's guides failed to implement the training that was, (or should have been), provided to them in regard to instructing participants on communication, participant braking, and emergency braking.
The operator/guide, failed to direct his attention to Ms. Ceithaml, failed to instruct her or to assist with a safe landing, all of which was a proximate cause of Ms. Ceithaml's injury. The guide's failure to perform the critical duties assigned to his position caused her to collide with the platform support tree. Simple and logical steps could have been taken by WRAVE in advance of Jennifer Ceithaml's accident which could have prevented the occurrence. Failure to properly train the guides and the failure to properly train Ms. Ceithaml, were more likely than not proximate causes of Ms. Ceithaml's collision and injuries. It is more likely than not that these failures to train existed on December 2014, as confirmed by plaintiffs, plaintiff photos and video of the lines, harness and platforms.

It is the responsibility of the Challenge Course operator to properly train and instruct participants in how to navigate the course. Participants are considered to have no background or other training in the use of the challenge course equipment or to have any understanding of the design, function or "inherent" risks of the course without being educated and adequately trained relative to those subjects. The standard of care obligated WRAVE to operate its course with guides capable of providing adequate training to participants, and that the guides are competent enough to implement their training by performing their critical duties.

The content of training for ride operators is provided in ACCT, ASTM and PRCA.

**ACCT 8th Edition, 2012**
**ASSOCIATION FOR CHALLENGE COURSE TECHNOLOGY**
**C.2.3.10.** The organization•s staff shall instruct and reasonably manage relevant canopy/zip line procedures and techniques which may include and are not limited to:
•Take-off
• Body positioning
• Body orientation and control
• Speed control
• Signals and commands
•Braking
• Landing and dismount
• Retrieval protocol
• Hand placement
• Contingency response procedures

**C.2.3.12.** The organizations understand, instruct and manage canopy tour/zip line take off, travel, and dismount.

ACCT RATIONALE
WRAVE guides instructed participants to brake with their gloved hand. Specifically, the braking procedure at the landing platform required the participant to brake depending on his speed and position on the zip line.

By failing to instruct participants how and when to brake, WRAVE compromised Ms. Ceithaml's safety. Such training is below the industry standard of care.

8

EDWARD M. PRIBONIC, P.E.

As clearly specified in ACCT section B2.4.3, the operator is required to teach speed control, braking, and the use a communication system for braking and landing.


WRAVE guides failed to execute whatever training they may have received relative to braking and landing zip line riders. The guide on the landing platform was inattentive to his duties, falling below the industry standard of care.

**OPINION No. 3**
- WRAVE maintained a dangerous condition at the landing platform with an inadequate vertical distance between the zip line and the platform. The exact distance is unknown as WRAVE failed to produce engineering drawings typically provided in the industry. This breached the industry standard of care by not having the zip line properly
engineered to maintain a safe line height relative to the platforms, and to provide the necessary clearances. In so doing, WRAVE failed to comply with the requirements of ACCT, PRCA, and ASTM to provide a landing platform which would facilitate the safe and expeditious movement of participants through the use of a properly designed ramp on the entry side of the landing platform. Failure to properly design and construct the ziplines and platforms were more likely than not proximate causes of Ms. Ceithaml's collision and injuries.

The configuration of the launch and landing platforms is critical. When riders approach a platform at some speed, the ACCT standard requires that a platform be configured to give the participant the advantage of a gradual stop. It is also important that the platform provide enough space for the participant to arrive without danger of collision with persons or structures. A sloped ramp, low at its entry and rising in the direction of rider travel, accommodates riders of various heights as well as provides a safeguard against a collision with a sharp edge of the platform as riders prepare to set their feet on the platform for stopping. WRAVE compensated for their design defects by instructing Ms. Ceithaml to keep her feet up so she would not strike the platform, (Depo P.97, L14-15).
WRAVE's landing platform had no approach ramp. The lack of a ramp was another problem contributing to Ceithaml's injury, exacerbating the danger from the inattentive guide and the low height of the zip line.
Industry standards provide specific guidance for the design and construction of platforms, and suggest the use of ramps for the gradual engagement of riders, and to avoid impact with the platform.

**ACCT**
### Challenge Course Standards
*Association for Challenge Course Technology (ACCT)*
*8th Edition, 2012*

**H.2. Zip Line Landing Areas shall:**
• Provide sufficient space for brake system operation and dismount procedures
• Provide protection from or limit unintended contact with ziplines, people and other components
• Be free from hazards that require participant action to avoid . Objects in the zip line landing area that have the potential to harm participants shall be covered with shock absorbing material
**APPENDIX A**
Certain elements, such as zip lines and high swing elements are more sensitive to lifeline tension, and the guys may need to be considered critical. Beyond this basic loading concept, tower structures and platforms in poles, plus wind, ice and snow loads, etc. add complexity to the designer's choice of pole and guy configuration and size. Such complexities warrant design consultation with a professional engineer.

ACCT RATIONALE

9

EDWARD M. PRIBONIC, P.E.

The relative distance, (height), between the zip line and WRAVE landing platform, on which Ms. Ceithaml was injured, was dangerously inadequate and did not provide space for her to extend her legs to slow or stop, as required by ACCT, and, as she needed to do under the particular circumstances of her ride, when the guide failed to brake her approach.

The low landing platform breached the standard of care because it turned the landing platform into a dangerous source of rider collisions, a condition that exacerbated the danger created by the inattention of the guide at the critical braking point in Ms. Ceithaml's ride.

Failure to provide an approach ramp resulted in inadequate space for Ms. Ceithaml to lower her feet to slow, stop and dismount free from harmful obstructions. The platform itself created a harmful obstruction. The line height breached the standard of care regardless of whether the attendant was performing his braking function.

WRAVE should have retained a professional engineer to determine the zipline tension, sag, and heights. WRAVE did not retain an engineer and did no calculations to determine the proper and safe elevations of its platforms. It constructed the platforms and then installed the
zip lines, subsequently it would have been obvious that the platform was too high or that the zipline was too low. Rather than retain an engineer, or dismantle the platform and rebuild it,
WRAVE apparently decided to avoid the cost of the recommended procedure and accept the defective platform configuration and place the responsibility for injury avoidance on the rider.

Cable height calculations were not only possible, but were the norm, and were necessary to calculate the line elevations at either end of a span, as well as the catenary, (sag), to accurately locate the line elevations and locate the platform elevations in compliance with industry standards. WRAVE should have consulted an engineer, (as advised by ACCT and PRCA), to properly design and document course as required by ASTM, at any time to eliminate the line/platform defects. To meet the standard of care, WRAVE should have hired an engineer to review and certify the design.

The point to be made here is that the tension, sag, and relative heights of the zipline and platform were wrong, as far as I observed it, resulting in a dangerous condition as explained above, which more likely than not a cause of Ms. Ceithaml's collision and injuries.

**PRCA**
**Ropes Challenge Course Installation, Operation, & Training Standards**
*Professional Ropes Course Association (PRCA)*
*MAY 2005, Version 9*

**Platforms**
**OVERVIEW**
The take-off and landing areas of a zip line usually require a platform in order to facilitate the safe and expeditious movement of participants across that particular line. The take-off platforms and usually the landing platforms require a solid structure capable of supporting twice the anticipated total load at any given time, with enough room to allow safe participant hookups and disconnects.

**TYPES**
Ground as well as tree or utility pole platforms of all types are possible and are only restricted by the ability to create a stable structure that is safe to work on for both the guide and participant. Access to and from the platform will also need to be both stable and safe.
Landing platforms will usually be of a ramp type, allowing the participants momentum to gradually dissipate over a short distance before coming to a stop. Angles of inclination of the landing ramps should not be severe.

PRCA RATIONALE
WRAVE failed to comply with the PRCA standards by not providing a landing platform with a ramp allowing for safe and expeditious movement of a participants, properly slow or stop himself, or enough room to allow safe participant hookups and disconnects.

10

Ramps were a standard safety feature and common design used throughout the zip line industry in 2015. WRAVE and their builder should have been aware of industry standards and should have complied with them, particularly knowing that they had constructed a dangerous landing platform.

**ASTM F2291-11  Standard Practice for Design of Amusement Rides and Devices**
**6. Patron Restraint, Clearance Envelope, and Containment Design Criteria**
6.6 *Patron Clearance Envelope Analysis*:
6.6.1 Amusement rides and devices shall be designed to provide a patron clearance envelope adequate to minimize the opportunity for contact between the patron and other objects where said contact is likely to cause injury.
The following shall be considered:
6.6.3.3 The physical nature of surrounding objects or surfaces that might otherwise be contacted, for example, sharp, hard, rough or abrasive, ability to snag or trap and hold, or  other attributes that may produce undesirable contact for the patrons of the ride or device.
6.6.3.6 The possibility of variations in the position or orientation of the patron carrying device, (for example, angular movement, side movement, unrestrained or undamped motion, or free swinging).
6.6.5 Any moveable system or device designed to temporarily encroach on the patron clearance envelope, that is, loading/unloading platforms, decks, or other devices, shall be designed in a fail-safe manner in order to prevent unintended contact.

ASTM RATIONALE
　　The risk of rider collisions with the platform and/or support tree were obvious and foreseeable. The installation of a simple approach ramp of appropriate length would have eliminated most, if not all, of the potential for collisions with the platform.
　　These types of situations are well known and are called to the attention of zip line designers and operators by the standards. WRAVE chose to ignore the advice of the standards and accepted an obviously dangerous condition. The absence of a ramp further
exacerbated the low line height defect which in turn exacerbated the danger created by the inattention of the guide at the critical braking point in Ms. Ceithaml's ride.

**OPINION No. 4**
　　WRAVE failed to provide a safe braking system as required by ACCT. Braking requirements for zip lines are specified by the ACCT. The braking system at the landing platform, was designed to rely on the rider. Riders must correctly and timely, brake themselves if they are to complete a safe landing. However, riders failing to properly brake themselves, or coming into the platform too fast, could strike the unpadded platform or tree. Participants must be properly instructed on the proper use of the brake. Ms. Ceithaml's was instructed to pull down on the green rope to brake, and to make sure her feet were up so she don't hit the platform. However, she was never instructed which ziplines her to brake or how to determine if she needed to reduce her speed. Her (green), brake line was not positioned to be readily available and she was not instructed to hold it throughout her zip experience. Her life/safety lanyard, (the line suspending her from the trolley and secured to her harness), was excessively long, positioning her such that the zipline, which she was to use as a brake, was approximately 8' above her. Since she received no training, or even a demonstration of the "brake", it is more likely than not that the excessive distance to the zipline would have required her to always hold the green line taut, ready to use, and the green line would have had some degree of slack and stretch to overcome before the brake would be effective, if in fact, it could be effective at all given its design, configuration and condition. Failure to properly design and test the braking system, and to instruct participants on its proper use, were more likely than not proximate causes of Ms. Ceithaml's collision and injuries.

**ACCT  8th Edition, 2012**

11

ASSOCIATION FOR CHALLENGE COURSE TECHNOLOGY
Chapter 1
**Design, Performance and Inspection Standards**
**H. ZIP LINE SYSTEMS**

**H.1. Brake System:** All zip lines shall be designed and installed with an integrated brake system.
**H.1.1.1. The Brake System shall:**
Limit the deceleration of the participant so as to prevent a hazard to the participant
• Perform its function without permanent deformation or failure of any associated components or equipment
• Arrest the motion of the participant regardless of participant orientation
• Not inhibit the participant retrieval procedure in the event that arrest occurs before the zip line landing area is reached
**H. 1.4. Test Requirements:** A qualified
person shall design the methods, oversee the performance, and assess the results of operational tests.
**H.1 .4.1.** In the following circumstances, testing shall be performed on a brake system by a competent person to determine proper system operation:
• Prior to commissioning of the zip line
• Whenever a brake system or component is changed, added or replaced
**H.1.4.2.** All tests shall provide proof of the following:
• Brake system operational characteristics at the extremes of the design continuum
for participant weight and arrival speed
• Confirmation that the brake system performs reliably and as designed

**H. 1.5. Inspection and Evaluation:** Zip line brake systems shall be evaluated according to the manufacturer's specifications as included in the documentation provided at the time of installation.

ACCT RATIONALE
Other zip line facilities were using passive brakes in 2010, (and many years prior), such as coil springs, eddy current rotary brakes, weights, etc., with good results.  WRAVE could have applied any of these as a secondary brake system which would have been superior to their single active brake.

**Opinion No. 5**
- WRAVE failed to provide an emergency braking system as required by ACCT.  If an emergency brake had been installed at the landing platform as required, even though the guide failed to perform his duties, an emergency brake would have prevented Ms. Ceithaml from colliding with the tree.
The failure to provide a passive secondary brake as required by ACCT 8th Edition, exacerbated the absence of a ramp, the failures of training or lack of execution of training, the low line height defect, and increased the danger created by the inattention of the guide at the critical braking point in Ms. Ceithaml's ride.  Even if the guide had been monitoring Ms. Ceithaml, the absence of an emergency brake was more likely than not a proximate cause of Ms. Ceithaml's injuries.

**ACCT  8th Edition, 2012**
**ASSOCIATION FOR CHALLENGE COURSE TECHNOLOGY**
**Chapter 1**
**Design, Performance and Inspection Standards**
**H.1.3. Emergency Brake**
**Requirements:** An emergency brake shall require no action by the participant and shall either be completely separate from the primary brake or an integrated backup feature of
the primary brake. An emergency brake shall be required if, upon failure of the primary brake, both of the following may occur:

12

· The participant arrives at the zip line landing area at a speed in excess of 6 mph (10 kph)
· The participant experiences unintended and/or harmful contact with terrain, objects or people in the zip line landing area


**ACCT 8th Edition, 2012**
**ASSOCIATION FOR CHALLENGE COURSE TECHNOLOGY**
**SECTION D: ACTIVITY SUPPORT SYSTEMS**
Explanatory Material
*ED4 Landing areas SHOULD be equipped with systems to facilitate ease of exit from the ZIP LINE. Padding may be necessary wherever there is a possibility of impact (such as a tree trunk, platform edge, step systems, and so on).*


**Opinion No. 6**
- WRAVE was fully aware from the opening of this course that there were collision possibilities at the landing platforms which is why they developed their ill-advised, unreliable protocol of having riders land with their legs tucked up.  It was obvious from the opening of the zipline that padding was necessary.  As a result of the probability that riders would strike the platform, the industry standard of care required the use of padding. The absence of padding was more likely than not a proximate cause of Ms. Ceithaml's collision and injuries.

   **ASTM F2291-11  Standard Practice for Design of Amusement Rides and Devices**
   **6. Patron Restraint, Clearance Envelope, and Containment Design Criteria**
   6.1 *Patron Containment*:
   6.1.2 Parts of amusement rides and devices that patrons may reasonably be expected to contact shall be… considered for padding as appropriate.

The improper construction of the platform made padding a necessity.  The use of padding was well known in 2014.  The absence of padding, exacerbated the lack of a passive secondary brake, and exacerbated the absence of a ramp, which exacerbated the low line height defect which further exacerbated the danger created by the inattention of the guide at the critical braking point in Ms. Ceithaml's ride.


**OPINION No. 7**
- WRAVE did not provide any instructional or warning signs disclosing the abnormal hidden dangers of the WRAVE park, for the benefit of participants as required by industry standards.  The Wacky Rollers Adventure Park contained multiple deficiencies and dangerous conditions which were not obvious to participants.  Unaware of such deficiencies and conditions, participants had to opportunity to weigh their options of participation or risk of injury based on their physical condition or physical abilities.  Failure to warn or inform Ms. Ceithaml was more likely than not a proximate cause of Ms. Ceithaml's collision and injuries.

   **ASTM Designation: F 770 – 11**
   **Standard Practice for Operation Procedures for Amusement Rides and Devices**
   **4. Owner/Operator's Responsibility**
   4.3 Signs presented by the owner/operator for instruction to the public shall be prominently placed, bold in design, with wording short, simple, and to the point.
   4.3.1 Signs to display operational instructions or requirements, or both, for use of the amusement ride or device may be posted at the waiting/loading area or other appropriate location and may include height requirements and other duties and obligations of the passengers such as but not limited to those listed in Section 5.

13

EDWARD M. PRIBONIC, P.E.

**OPINION No. 8**
- WRAVE maintained an unsafe environment by using unsound trees as platform supports, and failing to have all of the trees inspected and certified as suitable for use as structures in an aerial adventure course.  It is likely, and logical, that the small size of platforms resulted from the designer not knowing the capacity or soundness of the supporting trees.  The deficiencies of the platforms discussed in Opinion No. 3 are associated with the failure to comply with industry standards relative to trees as structures and was a proximate cause of Ms. Ceithaml's injuries.

**F2959 – 12 Standard Practice for Special Requirements for Aerial Adventure Courses**
**5. Owner/Operator Requirements**
5.1.9.2 When one or more live tree(s) are utilized in an Aerial Adventure Course, qualified person(s) shall perform an arboricultural inspection to determine that the
tree(s) are healthy and suitable for the intended use and that the original design intent is maintained. The inspections shall be performed:
*(1)* At a frequency of not less than once per year,
*(2)* After the occurrence of any significant environmental event, such as hurricane, tornado, lightning, ice storms, earthquake, flooding or drought,
*(3)* After any change in surrounding environment that could alter the health and integrity of the trees utilized, such as removal of adjacent trees or development of adjoining properties,
*(4)* Physical damage such as a major limb failure, when there is a change in the visible health of the tree or canopy, or both, due to disease or insect.



**Photo No. 9.**   In spite of disease and death of the trees used on the course, WRAVE failed to consult an arborist or engineer regarding use of the trees as structures. This circumstance violates the industry standard of care, and is dangerous.

14

EDWARD M. PRIBONIC, P.E.



**Photo No. 10.** Diseased and failing trees were also used for guy support. This condition violates the industry standard of care.

## C.   REASONS AND BASIS FOR OPINIONS

In the design and manufacture of any equipment that interfaces with people, it is of paramount importance, and is often directed by law, that a thorough process of evaluation, consideration and due diligence be applied to the design. The objective is to assure as far as reasonably possible, that such equipment can be safely used under all expected operating situations, by all intended users and under all foreseeable conditions.

Because the equipment involved in the subject incident, identified as a Zip Line, is an amusement ride as defined by the industry standards, the most directly applicable guides to proper design and operating requirements are detailed in the following documents:

ASTM Standards on Amusement Rides and Devices
*published by ASTM Committee F-24 on Amusement Rides and Devices,
Philadelphia, PA.*

Ropes Challenge Course Installation, Operation, & Training Standards
*Professional Ropes Course Association (PRCA)
MAY 2005, Version 9*

Challenge Course Standards
*Association for Challenge Course Technology (ACCT)
8th Edition, 2012*

15

EDWARD M. PRIBONIC, P.E.

**D.    CONCLUSIONS**

The most widely accepted standard relative to ropes courses and ziplines in North America is the ACCT Standard for Challenge Courses and Canopy/Zipline Tours, (Association for Challenge Course Technology), and represents the highest standard of safety.

Formally incorporated in 1993, the Association for Challenge Course Technology (ACCT) is the world's leading and largest American National Standards Institute (ANSI) Accredited Standards Developer, focused on the challenge course and aerial adventure course industries.

Celebrity Cruises promoted its excursions as its own, using advertising and language which led Ms. Ceithaml to believe that Celebrity Cruise Line was the primary operator of a safe shore excursion. Celebrity claimed to have "In-depth destination expertise". Celebrity clearly implied through its advertising language, that it operated its shore excursions using its own guides. Celebrity further stated that its partners adhere to the highest safety standards in the industry. It is a reasonable conclusion, based on my experience with ziplines in many parts of the world, and my participation in the development of zipline standards, that ACCT represents the highest safety standards in North America, if not the world. Celebrity further claimed that it knew that the WRAVE course was, at some point, inspected by an ACCT accredited company, presumably to the ACCT standards.

In fact, Celebrity had no zipline destination experience at all relative to safety, operations or construction. It offered no documents identifying Celebrity personnel with training or experience with zipline and no evidence that Celebrity ever consulted an expert in ropes courses or ziplines. Celebrity did not verify that supposed inspections were continuing throughout the period that Celebrity marketed excursions by WRAVE, not even knowing that the inspection company they refer to, was out of business years prior to the Ceithaml incident. Neither did Celebrity verify any training of WRAVE employees or the existence of safety protocol for participants or employees.

WRAVE failed to even come close to complying with industry standards of care, as detailed in this report, (above), in the design and operation of its ziplines. Their operation was far below the industry standard of care, operating without a passive braking system, without the proper elevation of the landing platform relative to the zipline, without adequate rider clearance, by its failure to instruct participants, by its failure to provide ramps and platforms with padding and its failure to provide adequate training to their guides. All of these conditions are clearly required and discussed in the relevant standards. All of the deficiencies noted in this report, as well as other violations of standards, by WRAVE and/or Celebrity, more likely than not caused the collision and injuries suffered by Ms. Ceithaml. It is my opinion that the conditions, deficiencies and violations seen on my inspection, and listed in this report more likely than not, existed on December 9, 2014, the date Ms. Ceithaml was injured. This opinion is based on my inspection, discussions with Ms. Ceithaml, her deposition, Mr. Ceithaml's video, photos and other documents listed in Appendix A, and the fact that for a period of 2-3 years prior to Ms. Ceithaml's injury, the WRAVE course was not inspected by an ACCT qualified person.

Respectfully submitted,

*[signature]*

Edward M. Pribonic, P.E.

*[Seal: REGISTERED PROFESSIONAL ENGINEER, Edward M. Pribonic, No. M 026253, Exp. 06/30/17, MECHANICAL, STATE OF CALIFORNIA]*

**APPENDIX A**
**MATERIALS REVIEWED**

16

EDWARD M. PRIBONIC, P.E.

Personal Inspection of WRAVE facilities, January 17, 2017

Inspection Photographs of Pribonic, Bolton and Ceithaml

Plaintiff video of Jennifer Ceithaml ziplining

Ropes Challenge Course Installation, Operation, & Training Standards
*Professional Ropes Course Association (PRCA)*
*MAY 2005, Version 9*

Challenge Course Standards
*Association for Challenge Course Technology (ACCT)*
*8th Edition, 2012*

ASTM Designation: F 770 – 11
Standard Practice for Operation Procedures for Amusement Rides and Devices

ASTM F2291-11  Standard Practice for Design of Amusement Rides and Devices

F2959 – 12 Standard Practice for Special Requirements for Aerial Adventure Courses

Amended Complaint

Plaintiff's Answers to Interrogatories

Defendant's Answers to Interrogatories

Deposition Transcript of Plaintiff

Requests for admissions and responses

Ceithaml - Operative Report & Injury Photographs

Asst. Shore Excursion Manager. Traveling Fleet Shore Excursion Manager
Booking info

Ceithaml Answers to Rogs 2 22 16

Ceithaml WRAVE additional docs

Ceithaml Celebs Resp to RFAs 1.22-16

Ceithaml Shore Ex Guide Brochure

Ceithaml -Tour Proposals (3)

Celebrity SE Comments Dec 2009 to April 2014

Contact Sheet - Dominica - WRAVE LTD 2013-2014

EDWARD M. PRIBONIC, P.E.

Correspond. OC

Dominica 2013-2014 Caribbean - WRAVE LTD - Island Style Hot Baths

Executed - Amendment No. 1 To Tour Operator Agreement

Guest Folio

Hotel Operations

Job Description Manual - Hotel Operations Celebrity - 16 .... Excursion Staff

047181-Photos of Platform In Trees

054707-Attached is the Waiver Pl Sign

062077-Booking Form

062082-Tickets Front and Back

062114-Certificate of Insurance

010282-Deck Log

015419-0perations Manual for Tour Operation

0)9690-Ceithalm's Sea Pass with Photo

Redacted 2012-2013-Dominica-WRAVE-The Lost World 4x4 (1 )

Redacted 2012-2013- Dominica-WRAVE -The Lost World 4x4

REDACTED 2012-2013- Dominica-WRAVE -Adventure Seeker

Redacted 2012-2013- Dominica-WRAVE -High Hopes Hi Hopes

REDACTED - 2012-2013- Dominica-WRAVE -Adventure Seeker

Redacted - 2012-2013- Dominica-WRAVE -Downstream River Ocean Kayak

OJ9690-Ceithalm's Sea Pass With Photo

Redacted 2012-2013- Dominica-WRAVE -The Lost World 4x4 (1 )

Redacted 2012-2013- Dominica-WRAVE - The Lost World 4x4

REDACTED 2012-2013- Dominica-WRAVE -Adventure Seeker

Redacted 2012-2013- Dominica-WRAVE -High Hopes Hi Hopes

EDWARD M. PRIBONIC, P.E.

REDACTED - 2012-2013-Dominica-WRAVE-Adventure Seeker

Redacted -2012-2013- Dominica-WRAVE -Downstream Rive ... O Ocean Kayak

Redacted - 2012-2013- Dominica-WRAVE -Downstream Rive ... O Ocean Kayak

Redacted- 2012-2013- Dominica-WRAVE -Dominica Natural High Zip Trip

Redaction 2012-2013- Dominica-WRAVE -Downstream River to Ocean Kayak

St Lucia 2013-2014 Caribbean - WRAVE Ltd - City Clickers Castries Captured Redacted

St Maarten 2013-2014 Caribbean-WRAVE Ltd., Phillipsburg

Tour Agreement Ceithaml

Tour Insurance Requirements

Tour Operator Contact Information Sheet - Dominica WRAVE 2012

WRAVE - City Clickers Redacted Information and Price Redacted

WRAVE Ltd - Island Traditions Herbal Remedies

WRAVE Tour Operator Uc 2013- 2016

Parallel Lines, Conference Edition, 2012

Parallel Lines, Spring Edition, 2012

2011 For Profit Corporate Filing

Florida Sunbiz.org Triple Eagle report

Celebrity Cruises website