JENNIFER CEITHAML,

   Plaintiff,

vs.

CELEBRITY CRUISES, INC.

   Defendant.

_____/

## ORDER

**THIS MATTER** is before the Court on Defendant Celebrity Cruises, Inc.'s ("Celebrity") motion for summary judgment. (DE 51; Statement of material facts, DE 52). Plaintiff Jennifer Ceithaml filed a response to the motion (DE 61) and Celebrity filed a reply in support (DE 66).[1] For the reasons below, Celebrity's motion (DE 51) is **GRANTED**.

## I.   BACKGROUND[2]

This case arises from injuries Ceithaml sustained during a shore excursion while a passenger on a cruise aboard the Celebrity *Summit*. Ceithaml and her

---

[1] Ceithaml's response incorporates responsive facts (DE 61 at 2-13) and Celebrity's reply incorporates a reply to Ceithaml's responsive facts (DE 66 at 2-16).

[2] This section sets forth the relevant admitted facts for purposes of summary judgment. In their respective statements of material facts, the Parties have provided various assertions that are supported by the record. In some instances, the Parties have not contested their adversary's assertions. In other instances, the Parties have contested their adversary's assertions but without citing sufficient materials in the record to refute those assertions. The Court will deem all of these uncontested—or insufficiently contested—factual assertions to be admitted. *See* S.D. Fla. L.R. 56.1(b); Fed. R. Civ. P. 56(c), (e).

husband set sail on the *Summit* on December 6, 2014. (Jennifer Ceithaml Deposition, DE 52-1 at 22). Three days into the cruise, on December 9, 2014, Ceithaml participated in a zip-line shore excursion in Dominica operated by Wacky Rollers Adventure Vacations and Expeditions, Ltd. ("Wrave"). (DE 52-1 at 38; DE 52 ¶¶ 15, 19). At the end of the second of two zip-line traverses she rode that day, she suffered a fractured left ankle when she struck padding attached to a tree behind a receiving platform. (DE 52-1 at 32-33; Wrave Passenger Accident Report, DE 52-10). Although Ceithaml received instructions on how to use a "brake rope" that was part of the ride, she claimed that the rope was out of reach during the first zip-line traverse she crossed and cannot recall whether she used the rope to slow down on the second traverse before her accident. (DE 52-1 at 31, 33, 35, 65, 82). Wrave's Passenger Accident Report stated that before the incident, Ceithaml did not use the brake rope, was "going a bit fast," and a staff member on hand "tried to use his body to reduce the impact of the landing but her legs were extended and hit the cushion." (DE 52-10).

Wrave has been in business since 1998. (DE 52 ¶ 26). It first started offering excursions to passengers on other cruise lines in 2000 and to Celebrity passengers in 2004. (Celebrity's Answer to Plaintiff's First Set of Interrogatories, DE 52-8 at 3). Wrave built the zip-line ride on which Ceithaml was injured in 2005 and began offering an excursion including the zip-line to cruise lines in early to mid-2006. (DE 52 ¶ 26; Celebrity Corporate Representative Amanda Campos Deposition, DE 52-2 at 68). In late 2006, Celebrity began offering its passengers the Wrave zip-line excursion. (DE 52-8 at 3). In 2011, after flooding

in Dominica, Wrave spent $600,000 on unspecified improvements to its facilities. (DE 61 ¶ 81).

Celebrity plays no role in the physical operation of Wrave's zip-line ride and disclosed this fact to Ceithaml on four separate occasions. First, before the trip, Ceithaml and her husband bought two tickets for the cruise on a computer in their home in Chicago. (DE 52-1 at 13). As part of this purchase, they had to acknowledge certain cruise ticket terms and conditions on Celebrity's website. (DE 52 ¶ 2; Ceithaml's responsive facts, DE 61 ¶ 2).[3] These terms and conditions—which Celebrity again provided to Ceithaml and her husband in a printed "Guest Ticket Booklet" after they boarded the *Summit*, contained a paragraph titled "Shore Excursions, Tours, Facilities, or Other Transportation" which stated:

> The providers, owners and operators of [excursion] services, conveyances, products and facilities are independent contractors and are not acting as agents or representatives of Carrier. Even though Carrier may collect a fee for, or otherwise profit from,

---

[3] Ceithaml asserts that she did not read or understand these terms and conditions—or any other disclaimers from Celebrity or Wrave—and dismisses them all as inaccessible "legal jargon," "legal fine print" (DE 61 ¶ 2), and "legalese" (DE 61 ¶ 16). Nevertheless, she admitted that she understood the nature of these documents; that she would not have been able to board the *Summit* without accepting the cruise terms and conditions; and that she would not have been able to participate in the zip-line excursion without accepting Wrave's disclaimers. (DE 52 ¶¶ 2, 9; DE 62 ¶ 9; DE 52-1 at 14, 27, 38). Accordingly, Ceithaml cannot now claim ignorance of binding terms and conditions. *See Racca v. Celebrity Cruises, Inc.*, 376 F. App'x 929, 931 (11th Cir. 2010) ("A passenger's failure to actually read the contractual provision at issue does not preclude his being bound. . . . The question is whether [he] received adequate notice of the . . . provision."); *Univ. of Miami v. Intuitive Surgical, Inc.*, 166 F. App'x 450, 453 (11th Cir. 2006) (failure to read contract before signing will not excuse "duty to read . . . and know its contents.").

making such arrangements and offers for sale shore excursions, tours, hotels, restaurants, attractions, the Land Tour and other similar activities or services taking place off the Vessel for a profit, it does not undertake to supervise or control such independent contractors or their employees, nor maintain their conveyances or facilities, and makes no representation, whether express or implied, regarding their suitability or safety.

(Guest Ticket Booklet, DE 52-4 at 15; *see also* DE 52 ¶ 5).

Second, also before the trip, Ceithaml and her husband purchased two shore excursions through Celebrity's website, including the Wrave excursion. (DE 52 ¶ 10; DE 52-1 at 11). A "Shore Excursions Guide" for the *Summit*, which was available on Celebrity's website but which Ceithaml does not recall reading also contained "terms and conditions" that provided:

SHORE EXCURSIONS, TRANSFERS AND SHORE TOUR PACKAGES ARE OPERATED BY INDEPENDENT CONTRACTORS.

(DE 52-5 at 83).[4]

Third, once Ceithaml was aboard the *Summit*, Celebrity delivered two tickets for the zip-line excursion—one for Ceithaml and another for her husband—to Ceithaml's cabin. (DE 52 ¶ 13; DE 61 ¶ 13; DE 52-1 at 17). Both tickets bore a "Celebrity X Cruises" logo (Zip-line shore excursion tickets, DE 52-6), but the front of the ticket stated: "Tour operated by: Wrave Ltd." (DE 52-6 at 1) and the back of the ticket, which Ceithaml did not read, stated:

---

[4] Ceithaml points out that the same document stated that "[i]n selling tickets, coupons, or vouchers, or making arrangements for shore excursions, the carrier acts only as an agent for others who operate such services," which she claims contradicts the quoted portion providing that excursions are operated by independent entities. (DE 61 ¶ 13). But this language actually reinforces that while Celebrity markets excursions to its passengers, "others . . . operate" those services.

> The providers of [excursion] services are independent contractors
> and are not acting as agents or representatives of Royal Caribbean
> Cruises Ltd., Celebrity Cruises Inc. or Royal Celebrity Tours, Inc.,
> or their respective affiliates or subsidiaries.

(DE 52-6 at 2).

Fourth, before participating in the zip-line on December 9, 2014, Ceithaml signed a document titled "Wacky Rollers Informed Consent & Participation Waiver of Liability/Release of Claims" (the "Liability Waiver"). (Liability Waiver, DE 52-7). Ceithaml claimed that she did not read the Liability Waiver because Wrave staff rushed her to sign it (DE 61 ¶ 18) and because she trusted Celebrity to guarantee the safety of the excursion (DE 52-1 at 27), but she also admitted understanding the nature of the document (DE 52-1 at 27). Nonetheless, the Liability Waiver identified "WRAVE Ltd." as the excursion operator and required Ceithaml to acknowledge "I understand the terms herein are contractual and not a mere recital." (DE 52 ¶ 18; DE 52-7).

Aside from the multiple instances in which Celebrity advised Ceithaml that Wrave operated the zip-line excursion, Celebrity and Wrave executed a Tour Operator Agreement before Ceithaml's incident that further defined the boundaries of their legal relationship:

> Operator will provide the Shore Excursions to the Passengers that
> satisfy the highest standards in the industry. Operator
> acknowledges that the control and responsibility of the Shore
> Excursion remains exclusively with the Operator.
>
> . . .
>
> Operator's relationship with Cruise Line during the term of this
> agreement shall be that of an Independent Contractor. Operator
> shall not have, and shall not represent that it has, any power, right
> or authority to bind Cruise Line or to assume or create any

5

obligation or responsibility, express or implied, on behalf of Cruise Line or in the Cruise Line's name. The terms herein shall not be deemed exclusive to Operator and nothing related in this agreement shall be construed as constituting Operator and Cruise Line as partners, or treating the relationships of employer and employee, franchisor and franchisee, master and servant, or principal and agent or joint venture between the parties hereto.

(Tour Operator Agreement, DE 52-9 at 1; *see also* DE 52-2 at 14-15). According to Celebrity's corporate representative Amanda Campos, Celebrity always respected Wrave's independence; never had any intent to enter into a joint venture with Wrave; never shared profits or losses with Wrave; and never owned any assets jointly with Wrave. (DE 52-2 at 73-74).

Megan Shaw, a Celebrity excursions account manager, confirmed that Celebrity did not share profits or employees with excursion operator. (Maria Megan Shaw Deposition, DE 52-3 at 30, 59). Instead, Celebrity selected each operator after vetting several options and then paid each operator a flat fee for every Celebrity passenger participating in the excursion. (DE 52-3 at 30). Therefore, in light of Celebrity's multiple disclosures to Ceithaml, the Tour Operator Agreement, Celebrity's protocol for selecting and paying operators, and the absence of competent evidence in the record showing that Celebrity controlled the excursion, it is undisputed that Wrave independently operated the zip-line ride on which Ceithaml was injured.

Celebrity also offers several reasons that it specifically selected and retained Wrave to operate the Dominica zip-line excursion. (DE 52-8 at 3; DE 52 ¶ 25). First, Celebrity thought Wrave had a "great reputation." (DE 52-2 at 49). Campos testified that in all Celebrity's years working with Wrave, it "never had

any negative reviews on them. We get only positive reviews on them" from passengers. (DE 52-2 at 49). Second, Celebrity knew that other cruise lines—Carnival and AIDA—had worked successfully with Wrave. (DE 52-8 at 3; DE 52-2 at 72). Third, Celebrity contracted with Wrave regarding other shore activities for approximately two years without incident before it started offering its passengers Wrave's zip-line excursion. (DE 52-3 at 68). Fourth, Celebrity believed Wrave was sufficiently experienced; Wrave had operated since 1998, had offered excursions to cruise passengers since 2000, and had handled between 45,000 and 50,000 passengers from Celebrity and the affiliated Royal Caribbean cruise lines. (DE 52-8 at 3; DE 52-2 at 68). Fifth, Celebrity found Wrave to have ample expertise in zip-line operation given that "[t]hey have been there day in and day out providing this tour to many different people, not only Celebrity and Royal passengers. They know what they're doing." (DE 52-2 at 49). Sixth, in 2006—before Celebrity began offering passengers the Wrave zip-line—Celebrity sent staff to "look at the tour, in general" and received no negative reports. (DE 52-2 at 43). Celebrity also periodically sent staff on "secret shopper" site visits to ensure that the excursions were running as advertised. These evaluators[5] "never [came] back and said, oh, this zipline is falling apart." (DE 52-2 at 51).

Seventh, and finally, Celebrity felt it had no reason to doubt Wrave's commitment to zip-line safety. Celebrity had multiple procedures in place to monitor safety issues involving Wrave. Specifically, Shaw testified that when

---

[5] Celebrity has no records of staff visiting Wrave's premises in the two years preceding Ceithaml's incident. (DE 52-2 at 34).

Celebrity first vetted Wrave in 2004, its standard practice was to request a reporting of all prior accidents involving injury. (DE 52-3 at 65-66). Separately, pursuant to the Tour Operations Manual, Wrave was required to notify Celebrity personnel of any "accident/incident involving serious injury. . . in person, by phone or via email as quickly as logistically feasible" and then follow up with "[d]etailed written reports including all impacted guest names and statements . . . as quickly as possible, preferably within 30 minutes after the incident." (DE 61-7 at 18-19; *see also* DE 61-1 at 17-18; DE 52-2 at 48, 68; DE 52-3 at 66). Despite these procedures, the record contains only one incident in the eight years Celebrity contracted with Wrave to operate the Dominica zip-line excursion—and that incident involved the rope swing portion of Wrave's course, not the zip-line. (DE 52 ¶ 33; DE 52-3 at 67). Until Ceithaml's accident, Celebrity did not know of a single passenger suffering zip-line-related injuries on Wrave's premises. (DE 52-8 at 3; DE 52-2 at 45).[6] In fact, Wrave informed Celebrity's corporate representative Campos after Ceithaml's incident that Ceithaml was the first person to suffer an injury on its zip-line. (DE 52-2 at 68).

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard, "[o]nly disputes over

---

[6] Ceithaml cites Shaw's general remark that "[t]here's been zip-lining incidents before" for the proposition that Celebrity was aware of zip-line incidents involving passengers aboard other Celebrity-affiliated vessels. (DE 61 ¶ 43). Shaw later expressly disavowed knowledge of any such accidents on Wrave's zip-line, such as that sustained by Ceithaml. (DE 61-1 at 42-43).

facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citations omitted). At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Finally, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a sufficient showing to establish the existence of an element essential to [his] case, and on which [he] will bear the burden at trial." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Thus, "[i]f the non-movant . . . fails to adduce evidence which would be sufficient . . . to support a jury finding for the non-movant, summary judgment may be granted." *Brooks v. Blue*

*Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## III. DISCUSSION

Ceithaml asserts three negligence causes of action against Celebrity sounding in federal maritime law.[7] These three claims rely, respectively, on theories of vicarious liability (joint venture, actual agency, and apparent agency); negligent hiring and retention; and failure to warn. Celebrity moves for summary judgment, arguing that the decision in *Wolf v. Celebrity Cruises, Inc.*, 101 F. Supp. 3d 1298, 1309 (S.D. Fla. 2015), *aff'd*, No. 15-12341, 2017 WL 1149092 (11th Cir. Mar. 28, 2017)—in which the Eleventh Circuit affirmed summary judgment for the same defendant on similar facts and claims—is dispositive. The Court agrees with Celebrity and, guided by the Eleventh Circuit's analysis in *Wolf*, addresses each of Ceithaml's causes of action below.[8]

---

[7] Federal maritime law applies to actions arising from alleged torts committed aboard a ship sailing in navigable waters. *See Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1321 (11th Cir. 1989). This principle extends to actions like this one, where the alleged torts occurred at an offshore location during the course of a cruise. *See Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 901 (11th Cir. 2004); *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012).

[8] As part of this analysis, the Court does not consider any contractual provisions purporting to limit Celebrity's liability for injuries to passengers caused by Celebrity's negligence. As other courts have recognized, 46 U.S.C. § 30509(a)(2) acts to void such provisions. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1335–36 (11th Cir. 1984) (predecessor to § 30509 "invalidates any contract provision purporting to limit a ship's liability for negligence to its passengers"); *Wolf v. Celebrity Cruises, Inc.*, 101 F. Supp. 3d 1298, 1306 (S.D. Fla. 2015) (collecting cases), *aff'd*, No. 15-12341, 2017 WL 1149092 (11th Cir. Mar. 28, 2017).

## A.    Count 1: Vicarious Liability

Ceithaml first seeks to hold Celebrity vicariously liable for Wrave's alleged negligence in failing to maintain the zip-line in a reasonably safe condition.  She proceeds under theories of joint venture, actual agency, and apparent agency. The Court addresses the joint venture and actual agency theories together and the apparent agency theory separately.

### 1.    Joint Venture and Actual Agency

"In a contract creating a joint venture, there must be '(1) a community of interest in the performance of the common purpose[;] (2) joint control or right of control[;] (3) a joint proprietary interest in the subject matter[;] (4) a right to share in the profits[;] and (5) a duty to share in any losses which may be sustained.'" *Wolf*, 2017 WL 1149092, at *8 (alterations in original) (quoting *Browning v. Peyton*, 918 F.2d 1516, 1520 (11th Cir. 1990) (citation omitted)).

As to actual agency, a qualifying relationship requires "(1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent." *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1236 (11th Cir.  2014) (citation omitted).  To determine whether Wrave was Celebrity's actual agent, the Court considers several probative factors, including:

> (1) direct evidence of the principal's right to or actual exercise of control; (2) the method of payment for an agent's services, whether by time or by the job; (3) whether or not the equipment necessary to perform the work is furnished by the principal; and (4) whether the principal had the right to fire the agent.

*See Wolf*, No. 15-12341, 2017 WL 1149092, at *7 (quoting *Franza*, 772 F.3d at 1236-37).

No reasonable jury could find on this record that Celebrity is liable for Wrave's alleged negligence under either a joint venture or an actual agency theory. The undisputed evidence shows that Celebrity and Wrave entered a Tour Operator Agreement that expressly vested exclusive control of the zip-line excursion with Wrave. (DE 52-9 at 1) ("Operator acknowledges that the control and responsibility of the Shore Excursion remains exclusively with the Operator."). Further, Celebrity independently marketed excursions to passengers and took as profit the difference between the amount it charged passengers and the amount it had to remit to Wrave as the contractually agreed "cost price" for each excursion ticket sold—by the individual ticket sold rather by time and hours expended by Wrave employees. *See Franza*, 772 F.2d at 1237 (billing by time "normally suggests an agency relationship."). Finally, no evidence suggests that Celebrity furnished Wrave with the equipment necessary to operate the zip-line; took any proprietary interest in Wrave's zip-line; shared profits or losses with Wrave; or otherwise acted in a way that would contradict the control term in the Tour Operator Agreement.

On closely analogous facts, the Eleventh Circuit held in *Wolf* that the district court appropriately granted summary judgment to the cruise line on the plaintiff's joint venture and actual agency theories. *Wolf*, 2017 WL 1149092, at *7-8 (affirming summary judgment for cruise line where zip-line operator retained exclusive control of excursion by contractual agreement, was paid by job rather

than by time, did not share in profits and losses, and received no equipment from cruise line).

Ceithaml endeavors to adduce facts and law that would create a triable issue as to "joint venture/control," but ultimately fails to do so.  (DE 61 ¶¶ 55-74, 87-88).  She starts by noting that courts have found, in contexts not involving excursion operators, that the right to control is a key factor in establishing a joint venture or an agency relationship.  *See Franza*, 772 F.3d 1225, 1236 ("In cases of medical malpractice, as in other maritime respondeat superior cases, the essential element of the relationship is the principal's control over its agents."); *Martins v. Royal Caribbean Cruises, Ltd.*, Case No. 15-21124, 2016 WL 6565942 (S.D. Fla. Nov. 3, 2016) ("This right to control is key in determining whether the Doctors are considered employees or independent contractors."); *Fulcher's Point Pride Seafood, Inc. v. M/V Theodora Maria*, 935 F.2d 208, 210, 213 (11th Cir. 1991) (affirming district court's finding that a joint venture existed where the plaintiff provided the operator of two fishing boats with necessary supplies, procured ship captains, and hired and fired captains without the operator's knowledge).   To demonstrate Celebrity's control here, she points to a Tour Operations Manual that Celebrity provided Wrave (Tour Operations Manual, DE 61-7; DE 61 ¶ 74) and to deposition testimony about Celebrity's relationship with Wrave.  But the specific evidence she cites is largely immaterial and does not create a genuine issue of fact over whether Celebrity exercised control over Wrave's zip-line excursion.

For instance, although Ceithaml correctly points out that Celebrity worked closely with operators, controlled the tour descriptions it gave to passengers, and informed operators that their actions reflected on the cruise line, none of these facts calls into question Wrave's undisputed independent operation of the zip-line. (DE 61 ¶¶ 55-57, 73; DE 52-9 at 1). Additionally, although Celebrity marketed excursions to its passengers and told Wrave it had recently shifted "our marketing from selling our ships as a destination to selling the port of call as a destination and then filling the calls with the demand," there is no evidence that this strategy was proprietary or that Celebrity used this strategy to exercise control over Wrave. (DE 61-1 at 416; *see also* DE 61 ¶¶ 61, 63, 72; DE 52-9 at 1).[9] Underscoring the fact that the Tour Operations Manual does not create an agency relationship between Celebrity and Wrave where none otherwise existed, the manual itself provides that "[n]othing in this manual shall impact the independent contractor status of all of our tour operators." (DE 61-7 at 4). And while Celebrity retained the unilateral right to terminate the Tour Operator Agreement with Wrave "for convenience," the Eleventh Circuit found in *Wolf*—on materially similar facts—that the same unilateral termination did not "allow a

---

[9] Ceithaml makes other observations that are ultimately unavailaing as to the question of control: Celebrity paid Wrave a contractually set price per ticket sold through an electronic payments system (DE 61 ¶ 65); Celebrity took bids from excursion operators before selecting which operators' services it offered to its passengers (DE 61 ¶ 63); Celebrity monitored excursion operators, including through site visits, and reserved the right to alter or exit relationships that no longer benefited Celebrity (DE 61 ¶¶ 58-60, 64, 68); and Celebrity applied pressure on operators to cut costs and facilitate increases in Celerity's earnings. None of these facts contradict the undisputed record evidence that Celebrity did not exercise control over Wrave's operation of the zip-line ride.

14

reasonable jury to conclude that Celebrity exercised a degree of control . . . so as to create an agency relationship." *Wolf*, 2017 WL 1149092, at *8. In sum, the record before the Court cannot support a reasonable jury's conclusion that Celebrity and Wrave had a joint venture or actual agency relationship.

## 2. Apparent Agency

"Admiralty law allows 'plaintiffs to sue shipowners based on the apparent authority of third-parties' in cases involving maritime torts." *Wolf*, 2017 WL 1149092, at *8 (quoting *Franza*, 772 F.2d at 1250–51). "Unlike actual agency, the doctrine of apparent agency allows a plaintiff to sue a principal for the misconduct of an independent contractor who only reasonably appeared to be an agent of the principal." *Franza*, 772 F.2d at 1249. To show apparent agency, Ceithaml must establish "first, a representation by the principal to the plaintiff, which, second, causes the plaintiff reasonably to believe that the alleged agent is authorized to act for the principal's benefit, and which, third, induces the plaintiff's detrimental, justifiable reliance upon the appearance of agency." *See id.* at 1252.

Ceithaml argues that Celebrity, through one sentence on its website, represented that Wrave was its agent: "Your excursions are planned by insured **partners**." (DE 61-1 at 130-36) (emphasis added).[10] She claims that despite Celebrity's multiple representations to the contrary, she understood this general statement to mean that Wrave was Celebrity's agent and that she relied on this

---

[10] Ceithaml also argues that she relied on an email from Celebrity containing statements to the same effect (DE 61 ¶ 44), but her own deposition testimony—in which she stated that she does not recall receiving such an email—contradicts this claim. (DE 52-1 at 16).

understanding to her detriment.[11] Ceithaml also points to Celebrity's inclusion of the "Celebrity X" logo on the excursion ticket—which also stated "Tour Operator: Wrave Ltd." and contained a disclaimer identifying Wrave as an independent entity—as supporting her claim of apparent agency.

These documents and statements do not create a genuine issue of fact as to whether Wrave "reasonably appeared to be [Celebrity's] agent." *See Wolf*, 2017 WL 1149092, at *8 (quoting *Franza*, 772 F.2d at 1249). Celebrity repeatedly disclosed to Ceithaml that Wrave was an independent entity within the documents containing—indeed, alongside—the very statements and representations on which Ceithaml claims she relied. *See Wolf*, 2017 WL 1149092 at *8 ("Mr. Wolf's purported belief that [the zip-line operator] was an agent of Celebrity, however, is not reasonable in light of the two separate disclaimers he received—the Cruise Ticket Contract and the Shore Excursion Ticket—which expressly stated that excursion operators were independent contractors and not agents or representatives of Celebrity, as well as the . . . Liability Waiver, which reiterated that the zip-line excursion was owned and operated by" an independent company.). Further, as noted previously, Ceithaml's reliance on *Martins* for her apparent agency claim is misplaced. *Martins* is factually distinguishable because there, the alleged apparent agent was a shipboard doctor, not an independent corporate entity that operated a

---

[11] Notably, another part of the same website—a screen capture of which is attached to Ceithaml's briefing—stated: "The providers of tour arrangements are independent contractors and are not acting as agents or representatives of Celebrity Cruises. In no event shall Celebrity Cruises be liable for any accident or harm to passenger, which occurs as a result of any acts, omissions, or negligence of any independent contractors." (DE 61-1 at 136).

shore excursion. *See Martins*, 2016 WL 6565942 (denying summary judgment for cruise line on apparent agency theory in relation to medical malpractice claims against shipboard doctor). Accordingly, the Court grants summary judgment for Celebrity on Ceithaml's apparent agency theory of negligence.

## B. Count 2: Negligent Hiring and Retention

The next cause Ceithaml advances is that Celebrity was negligent in hiring and retaining Wrave to operate the zip-line excursion. "Under Florida law, 'an employer is subject to liability for physical harm to third persons caused by [its] failure to exercise reasonable care to employ a competent and careful contractor (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or (b) to perform any duty which the employer owes to third persons.'" *Wolf*, 2017 WL 1149092, at * (quoting *Davies v. Commercial Metals Co.*, 46 So.3d 71, 73 (Fla. 5th DCA 2010)). To succeed in her negligent hiring and retention claim, Ceithaml must establish that Wrave was (1) incompetent or unfit to perform the work; (2) Celebrity knew or reasonably should have known of the particular incompetence or unfitness; and (3) the incompetence or unfitness was a proximate cause of the plaintiff's injury. *See Davies*, 46 So.3d at 74.

Ceithaml asserts a triable issue based on the report of her expert, Edward Pribonic, which concluded that Wrave failed to maintain the zip-line course to the standards of an organization called the Association of Challenge Course Technology ("ACCT"). (Edward Pribonic Report, DE 61-11).[12] Even if Pribonic's

---

[12] Pribonic's report is the subject of Celebrity's separate motion to exclude (DE 53). The report identified several general safety deficiencies with the zip-line course and summarily concluded each of these were "more likely than not the

report thereby creates a genuine issue as to Wrave's unfitness, it does not establish the second element—that Celebrity knew or reasonably should have known of Wrave's alleged safety issues.

In *Wolf*, the Eleventh Circuit considered whether the plaintiff's expert, an ACCT founding member named Timothy Kempfe, offered testimony which carried the plaintiff's negligent hiring and retention and failure to warn claims past summary judgment. *Wolf*, 2017 WL 1149092, at *5-7. The plaintiff argued that Kempfe's testimony created a genuine issue as to whether the cruise line conducted adequate diligence. *Wolf*, 2017 WL 1149092, at *5-7. But the Eleventh Circuit observed that while Kempfe made "broad statements" about the ACCT's applicability as an industry standard, he cited no "governmental organization . . . statute or act that requires companies to follow regulations issued by the ACCT." *Id.*, at *6. The Eleventh Circuit also noted that while Kempfe mentioned another cruise line "mandate[d] an external professional inspection by an ACCT approved Professional Vendor Member," he failed to provide "further details, such as the timing or frequency of such an inspection, or if the inspection is conducted pursuant to ACCT's regulations." *Id.*, at *6. In affirming summary judgment on the plaintiff's negligent hiring and retention claim,

---

proximate cause" of Ceithaml's accident, but did not explain how any individual deficiency actually contributed to Ceithaml's injuries according to Ceithaml's recounting of the events. Significantly, Ceithaml contradicted Pribonic's report in several respects, most particularly with regard to what Pribonic characterized as Wrave's failure to "properly train" Ceithaml. (DE 61-11 at 9). Ceithaml herself testified that "[t]hroughout the process of getting the equipment put on," Wrave staff instructed her to "pull down on the green rope to brake. And make sure your feet are up so you don't hit the platform." (DE 51-1 at 25).

the Court concluded that the record was devoid of evidence that "Celebrity knew or should have known" of the excursion operator's alleged failure to satisfy ACCT standards and that Kempfe's "conclusory statements fail[ed] to demonstrate industry standards against which a trier of fact could consider in determining whether Celebrity breached a duty to its passengers by not conducting annual inspections, or inspections by an outside professional." *Id.* at *6-7.

Here, as in *Wolf*, "[t]he record is devoid of evidence demonstrating that . . . Celebrity knew or should have known of any deficiencies." *Wolf*, 2017 WL 1149092, at *7. Celebrity offers an array of reasons why it selected and retained Wrave: its uniformly positive reputation; its work with other reputable cruise lines; its successful relationship with Celebrity before the zip-line ride was operational; its years of experience with the zip-line and its resulting expertise; its successful handling of tens of thousands of Celebrity passengers; and the absence of negative reviews after site visits from Celebrity's staff. Importantly, Celebrity had no reports of passengers sustaining injuries on Wrave's zip-line ride before Ceithaml—even though it had procedures in place to ensure that it received notice of such incidents.[13] These reasons belie Ceithaml's argument that Celebrity knew or should have known of the alleged problems with Wrave's zip-line.

---

[13] As the Court in *Wolf* observed, the unlikelihood that Wrave could operate a zip-line for eight years without a serious safety incident is "not a substitute for evidence. This record does not contain any affirmative evidence of safety concerns or reports of injuries caused by safety concerns." *Wolf*, 2017 WL 1149092, at *5.

Ceithaml responds—like Wolf—by arguing that Celebrity "should have known of Wrave's incompetence as a zip-line operator" but failed to gain such knowledge due to inadequate diligence. (DE 61 ¶ 110). In support, she points to several ultimately irrelevant reasons why Celebrity might have investigated further,[14] none of which create a genuine issue that Celebrity should have known of safety issues with Wrave's zip-line ride. But the heart of her argument is that Wrave's "substantial violations of accepted industry standards"—that is, ACCT standards—itself constituted notice of safety issues. (DE 61 ¶ 107). Pointing to testimony from Pribonic, Celebrity's expert Richard Klajnscek, and Shaw, Ceithaml argues that ACCT sets safety standards that are the most widely accepted in the zip-line business. (DE 61-11 at 17; Richard Klajnscek Report, DE 61-2 at 12; Edward Pribonic Deposition, DE 61-9 at 149-51). None of this testimony demonstrates or even suggests that ACCT standards were binding on Celebrity—or for that matter, Wrave—such that a reasonable jury could conclude that Celebrity had notice of safety problems because it failed to impose or require adherence to those standards. See Wolf, 2017 WL 1149092, at *6.

Additionally, Ceithaml does not explain why Celebrity—as opposed to Wrave—was required to guarantee Wrave's compliance with ACCT standards. Although Pribonic testified that ACCT standards require a "park to have an annual inspection, and then . . . daily inspections by the operators, the annual

_____

[14] These include that Wrave renovated its excursion site after flooding in 2011; that Celebrity stated on its website that its excursion operators "adhere to the highest safety standards"; that Celebrity vetted excursions before marketing them to passengers; and that Celebrity knew about the general dangers of zip-lining and about an earlier incident on the separate ropes portion of Wrave's course. (DE 61 ¶¶ 109-110).

being done by an outside third party," (DE 53-1 at 156), Ceithaml proffers no evidence that ACCT requires Celebrity to arrange these inspections. The absence of such evidence is important because Wrave represented to Celebrity that it satisfied ACCT standards by contracting with a third-party vendor to conduct annual inspections and by having staff inspect the zip-line every morning. (DE 61 ¶ 78; DE 52 ¶ 28; DE 52-2 at 44). Although there are indications that Wrave's ACCT-certified inspector went defunct in 2012 (DE 52-2 at 45), Celebrity reasonably trusted Wrave's representations because Celebrity "never had an incident on the ziplines" and understood Wrave to be an "expert on ziplines . . . that operates a zipline day in and day out for many different people." (DE 52-2 at 49). Celebrity also required Wrave to obtain insurance and believed that "in order to get insurance, the insurance company ha[d] to, in a sense, vet the shore excursion. They ha[d] to make sure that—they wouldn't insure someone who did not believe was safe and at the highest safety standards." (DE 52-2 at 72; see also Tour Operator Agreement Insurance Requirements, DE 52-9 at 7).[15] In sum, Celebrity actively sought to become aware of safety issues and had several reasons to believe that Wrave was operating a safe ride. In these circumstances, Celebrity cannot reasonably have been expected to know about the problems Ceithaml's expert raised, and thus cannot be liable for negligent hiring and retention.

---

[15] It should be noted that there is no evidence in the record suggesting Wrave's insurer actually performed vetting, although Wrave's insurance policy permitted the insurer to "make inspections and surveys at any time." (DE 61-1 at 340). The policy also provides that the insurer does "not make safety inspections" or "undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public." (DE 61-1 at 340).

### C.    Count 3: Failure to Warn

Ceithaml's final cause of action relates to Celebrity's purported negligence in failing to warn her about the risks associated with use of the particular zip-line ride at issue in this case.  To establish Celebrity' negligence, Ceithaml must show that (1) Celebrity had a duty to protect her from a particular injury; (2) Celebrity breached that duty; (3) the breach actually and proximately caused her injury; and (4) she suffered actual harm.  *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012).

In *Wolf*, the Eleventh Circuit explained the standard the Court must apply in determining the first element, whether Celebrity had a duty to warn Ceithaml of the dangers of the zip-line:

> The existence of a duty is a question of law.  A shipowner generally owes to its passengers a duty to exercise reasonable care under the circumstances.  This includes a duty to warn of known dangers beyond the point of debarkation in places where passengers are invited or reasonably expected to visit.  But the duty to warn encompasses only dangers of which the carrier knows, or reasonably should have known.  **Accordingly, as a prerequisite to imposing liability, a carrier must have had actual or constructive notice of the risk-creating condition.**

*Wolf*, 2017 WL 1149092, at *4–5 (emphasis added) (quotation marks and citations omitted).  In that case, the Eleventh Circuit found Celebrity owed no duty to the plaintiff because, although a cruise line may not "shirk its responsibility of reasonable care to its passengers, . . . the record demonstrates that Celebrity conducted its due diligence at the front end and had no reason to question the continued safety of [the excursion operator's] zip-line."  *Id.* at *5.

22

As discussed in the negligent hiring and retention context, Celebrity had no notice of the alleged risk-creating conditions here and thus cannot be liable for failure to warn. After conducting diligence and monitoring performance, Celebrity found that Wrave had a positive reputation, sound experience, and expertise in zip-lines. It had no reason to believe that there were safety issues with Wrave's zip-line and in fact received assurances—which it reasonably believed—that Wrave satisfied ACCT standards. Consequently, Celebrity had no notice of issues with the safety of Wrave's zip-line, had no duty warn Ceithaml, and was not negligent. *See Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989) ("[T]he benchmark against which a shipowner's behavior must be measured is ordinary reasonable care under the circumstances, a standard which requires, as a prerequisite to imposing liability, that the carrier have had actual or constructive notice of the risk-creating condition.").

As she did at the pleading stage, Ceithaml responds by advancing the theory that Celebrity had a heightened duty to inspect, warn, and correct because of the inherent dangers of zip-lines and because Celebrity stated on its website that its "excursion partners adhered to highest safety standards in the industry." (DE 61 ¶ 113). Federal maritime law in this Circuit, however, does not support such a heightened standard: Celebrity had no duty to warn or correct because it had no actual or constructive notice of any risk-creating condition. *See Keefe*, 867 F.2d at 1322.[16]

---

[16] The federal cases Ceithaml cites for the proposition that "circumstances frame the applicable duty of care in each case" (DE 61 ¶ 112) do not support the imposition of a heightened duty in derogation of binding precedent. *See Witover*

23

To the extent Ceithaml argues Celebrity lacked notice but is still liable because it created a risk by making statements on its website, she misapprehends those cases where courts allowed claims against cruise lines to proceed without notice because the cruise line designed, manufactured, or affirmatively created the dangerous condition. *See e.g.*, *Holderbaum v. Carnival Corp.*, 87 F. Supp. 3d 1345, 1358 (S.D. Fla. Feb. 19, 2015) (denying summary judgment where plaintiff argued that defendant cruise line failed to inspect an upturned rug aboard the vessel in violation of industry inspection standards); *McQuillan v. NCL (Bahamas) Ltd.*, No. 14-cv-23823, 2015 WL 7294828 (S.D. Fla. Nov. 19, 2015) (denying summary judgment on notice where plaintiff tripped and fell over step while looking for luggage, which the cruise line had arranged around step); *Rockey v. Royal Caribbean Cruises, Ltd.*, No. 99-cv-708, 2001 WL 420993, at *4 (S.D. Fla. Feb. 20, 2001) (denying summary judgment where plaintiff was injured by a falling six-foot bingo board that defendant cruise line had affixed to a wall in a lounge aboard the vessel). Here, Wrave—not

---

*v. Celebrity Cruises, Inc.*, 161 F. Supp. 3d 1139, 1147 (S.D. Fla. 2016) (denying defendant's motion to dismiss duty to warn claim because a "passenger has few ways of determining what the cruise line knew or should have known" of a dangerous condition before discovery); *Carroll v. Carnival Corp.*, No. 11-23372-CIV, 2013 WL 1857115, at *4 (S.D. Fla. May 2, 2013) (holding that "whether a carrier is negligent, or not, depends on if it acted reasonably under the fact-driven circumstances of each case" but ultimately finding "nothing in the record that indicates that Carnival should have been on notice"). Ceithaml also misguidedly relies on wholly distinguishable Florida cases outside the maritime context. *See Johnson Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182 (Fla. 2003) (reversing grant of summary judgment on consolidated cases involving state law negligence claims); *McCain v. Florida Power Corp.*, 593 So. 2d 500 (Fla. 1992) (reversing intermediate appellate court and reinstating jury verdict for the plaintiff in a negligence claim); *Goldberg v. Florida Power & Light Co.*, 899 So. 2d 1105, 1108 (Fla. 2005) (reversing intermediate appellate court and reinstating final judgment for the plaintiff in a wrongful death action).

Celebrity—created any dangerous condition that may have existed on the zip-line aboard which Ceithaml suffered injuries.

Neither does Wrave's alleged failure to maintain the zip-line to ACCT standards create a triable issue on Ceithaml's failure to warn claim. Ceithaml's proffered evidence "fail[s] to demonstrate industry standards against which a trier of fact could consider in determining whether Celebrity breached a duty to its passengers." *See Wolf*, 2017 WL 1149092, at *6. Ceithaml's argument that the very act of Wrave's failure to maintain the zip-line to ACCT standards constituted notice (DE 61 ¶ 115) is wholly unpersuasive for the reasons discussed above— primarily that Wrave represented and Celebrity reasonably believed that an ACCT-certified vendor inspected the zip-lines. Consequently, Celebrity is entitled to summary judgment on Ceithaml's failure to warn claim because it had no notice of the risk-creating condition and therefore no duty to warn about or correct such condition.

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendant's motion for summary judgment (DE 51) is **GRANTED**. Defendant's motion to strike (DE 53) is **DENIED AS MOOT**. The Court will enter final judgment separately pursuant to Rule 58 of the Federal Rules of Civil Procedure.

**DONE AND ORDERED** in chambers in Miami, Florida, this 20 day of June, 2017.

_____
KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE